KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs,

v.

The UNITED STATES and The United States Department of Commerce, Defendants,

Federal–Mogul Corporation; The Torrington Company, Defendant–Intervenors.

Slip Op. 95–171.
Court No. 93–08–00448.

United States Court of International Trade.

Oct. 13, 1995.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Neil R. Ellis and Robert A. Calaff, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Jeffrey M. Telep, of counsel; Michelle Behaylo, Thomas Fine, Anna Park and David Ross, Attorney–Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendants.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, Larry Hampel and Joseph A. Perna, V, for defendant-intervenor Federal–Mogul Corporation.

Stewart and Stewart, Terence P. Stewart, James R. Cannon, Jr. and Lane S. Hurewitz, for defendant-intervenor The Torrington Company.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Seiko Corporation of U.S.A. (collectively "Koyo"), commenced this action challenging certain aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final results of its third administrative review of certain antifriction bearings ("AFBs") (other than tapered roller bearings) and parts thereof from Japan covering the period of May 1, 1991 to April 30, 1992. *See Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order ("Final Results")*, 58 Fed.Reg. 39,729 (July 26, 1993).

### Background

On May 15, 1989, Commerce published antidumping duty orders covering AFBs including ball bearings, cylindrical roller bearings and spherical roller bearings and parts thereof imported from several countries, including Japan. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller*

*Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan,* 54 Fed.Reg. 20,904 (1989).

On June 11, 1990, Commerce initiated an administrative review for the period of November 9, 1988 to April 30, 1990. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews,* 55 Fed.Reg. 23,575 (1990). The final determinations of that review were published on July 11, 1991. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 31,754 (1991).

On June 28, 1991, Commerce initiated a second administrative review for the period of May 1, 1990 to April 30, 1991. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 56 Fed.Reg. 29,618 (1991). Commerce issued the final determinations for the second administrative review on June 24, 1992. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews ("1990/91 Final Results"),* 57 Fed.Reg. 28,360 (1992). On December 14, 1992, Commerce amended the 1990/91 Final Results to correct clerical errors. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 59,080 (1992).

On July 6, 1992, Commerce initiated a third administrative review covering the period of May 1, 1991 to April 30, 1992. *See Antifriction Bearings (Other Than Tapered*

*Roller Bearings) and Parts Thereof; Initiation of Antidumping Administrative Reviews and Request for Revocation of Order (in Part),* 57 Fed.Reg. 29,700 (1992). On April 27, 1993, Commerce published the preliminary results of the third administrative review. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty, Administrative Reviews and Partial Termination of Administrative Reviews,* 58 Fed.Reg. 25,616 (1993). Commerce published the Final Results of the third review on July 26, 1993. *See Final Results,* 58 Fed.Reg. at 39,729.

Koyo moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record, alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) use of best information available ("BIA") for cost of production ("COP") data; and (2) use of BIA to compute discount adjustments.[1] *Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Judgment on the Agency Record ("Koyo's Brief")* at 2–36.

## Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of

---

1. Plaintiffs abandoned two of the four counts in their complaint. *See Plaintiffs' Reply to Memoranda filed by Defendants and Defendant–Interve-* *nors in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Koyo's Reply Brief")* at 2.

the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Use of best information available for cost of production data*

In this review Commerce resorted to BIA after Koyo failed to provide Commerce with COP data for the calculation of United States Price ("USP"). *Koyo's Brief* at 11–14. Koyo objects to Commerce's "rigid and mechanistic" application of three rules: (1) the definition of related parties; (2) the one percent "Roller Chain" threshold; and (3) the use of respondent's highest prior margin rate as BIA. *Koyo's Brief* at 16.

■ First, Koyo contends that Commerce's application of BIA is unlawful and punitive because Koyo's failure to provide the requested information was due to a related company's exclusive control over the information and not Koyo's failure to cooperate. Koyo argues that the definition of related parties is unreasonable in light of the fact that Commerce may expect one company to gain access to highly confidential and sensitive information from another affiliated company even though the companies are only remotely related. *Id.* at 16–18. According to Koyo, Commerce is not compelled by 19 U.S.C. § 1677(13)(D) (1988) to treat companies that are connected only through a long series of companies as "related" for the purpose of providing information. *Id.* at 17. Koyo claims that it would be impossible for one company to gain access to another company's confidential information especially if the relationship of the companies is as tenuous as it is in the present case. *Id.* at 17–18. Koyo contends that its failure to provide the COP data requested by Commerce was due to the "related" company's refusal to divulge the information to Koyo. *Id.* at 18.

■ Second, Koyo claims that the one percent "Roller Chain" [2] threshold applied by Commerce is rigid and unfair because it is not based in statute or well-established Department practice. *Id.* at 18. Koyo's strong-

est support for this claim is Commerce's decision to change the threshold, without explanation, from five percent to one percent late in the review. *Id.* at 19–20. According to Koyo, Commerce's use of BIA is punitive because of the insignificant amount by which the entered value of the merchandise at issue exceeded the one percent threshold. *Id.* at 20.

■ Finally, Koyo claims that the effect of Commerce's application of BIA is punitive and, therefore, unlawful. Koyo maintains that Commerce's application of an extremely high BIA rate is unfair particularly in light of Koyo's inability to obtain the requested information. *Id.* at 22–24. Koyo contends that Commerce's actions are inconsistent with the remedial purpose of the antidumping duty statute. *Id.* at 26.

In rebuttal, Commerce claims that Koyo and the "affiliated" company in question are clearly related parties as defined by the relevant statute. *Defendant's Memorandum in Opposition to the Motion of Koyo Seiko Co., Ltd. and Koyo Seiko Corporation of U.S.A. for Judgment Upon the Agency Record* ("*Commerce's Brief*") at 10. *See also* 19 U.S.C. § 1677(13)(D). Commerce further asserts that its responsibilities do not extend to the determination of which party caused the failure to provide the requested information. *Commerce's Brief* at 10–11. Commerce stresses that it has neither the time nor the resources to conduct this type of inquiry. *Id.* at 11. Commerce expresses a fear that accepting Koyo's arguments could lead to an inability to determine whether related parties are colluding to deny Commerce access to information. *Id.* at 12. Furthermore, Commerce points out that no evidence in the record even indicates that the affiliated party in question ever rejected Koyo's request for the information. *Id.*

Commerce further responds that its decision not to apply the "Roller Chain" exception was appropriate. According to Commerce, the legislative intent of § 772(e)(3) of

---

**2.** Imports of scope merchandise are not subject to antidumping duties if they comprise an insignificant amount of the sales value of the finished product sold to unrelated customers in the Unit- ed States. *See Roller Chain, Other Than Bicycle, From Japan; Final Results of Administrative Review of Antidumping Finding,* 48 Fed.Reg. 51,- 801, 51,804 (Nov. 14, 1983).

the Tariff Act of 1930 (the "Act") is to ensure that the antidumping law covers further-processed merchandise. *Id.* at 13. Commerce asserts that the purpose of the "Roller Chain" exclusion is to exempt from the reporting requirements mandated by the Act "those products that were so thoroughly reprocessed in the United States as to make the imported value insignificant." *Id.* at 13. Thus, Commerce argues that applying the "Roller Chain" exception to a case in which the relative value of the imported portion of the finished product is "significant," as in this case, distorts the purpose of § 772(e)(3) of the Act. *Id.* at 13–14.

Finally, Commerce asserts that it properly applied BIA to compute COP. Commerce argues that relying on Koyo's highest rate from the less than fair value ("LTFV") investigation is not punitive because Commerce did not have any probative information about the rate of dumping of the bearings model at issue during the period of review. *Id.* at 15. Commerce further alleges that Koyo did not present any viable alternative. *Id.* at 16.

In support of Commerce, Federal–Mogul Corporation ("Federal–Mogul"), states that the definition of related parties was created by Congress and, thus, Koyo's claim that the definition is unreasonable concerns Congress, not Commerce. *Opposition of Federal–Mogul, Corporation, Defendant–Intervenor, to the Motion of Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. for Judgment on the Agency Record ("Federal–Mogul's Brief")* at 6. The Torrington Company ("Torrington"), also supports Commerce by maintaining that whether the affiliated party rejected Koyo's request is irrelevant because the burden of supplying the requested information is on the respondent. *Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Torrington's Brief")* at 14–15.

Federal–Mogul further asserts that although legislative history discourages Commerce from pursuing investigations of insignificant amounts of imported products included in products sold after further processing, Congress has still delegated to Commerce the authority to determine what amounts are significant. *Federal–Mogul's Brief* at 7–8. Torrington also claims that the one percent "Roller Chain" exception is based on established agency practice. *Torrington's Brief* at 17–18.

Federal–Mogul and Torrington also support Commerce's application of BIA. *See Federal–Mogul's Brief* at 8–11; *Torrington's Brief* at 20–24.

Section 1677e(c) of Title 19, United States Code (1988), states that Commerce "*shall, whenever a party* or any other person refuses *or is unable to produce information requested* in a timely manner and in the form required, or otherwise significantly impedes an investigation, *use the best information otherwise available*" (emphasis added). Thus, Koyo's claim that it was unable to access the requested information from the related company is irrelevant under the statute. Section 1677e(c) of Title 19, United States Code, does not expressly create an extra duty of Commerce to analyze the given reasons why a respondent has failed to produce requested information. The statute simply authorizes Commerce to use BIA if a respondent has failed to meet its burden of producing requested information.

Section 1677(13) of Title 19, United States Code, defines related parties as:

(D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

It is undisputed that Koyo and the affiliated party in question are related under the definition set forth in 19 U.S.C. § 1677(13)(D). *Koyo's Brief* at 16–17. Koyo argues, nevertheless, that it is unreasonable to apply this definition in the context of the present case. *Id.* at 17.

Contrary to Koyo's contentions, case law strongly illustrates that even if there were evidence showing that the related party was

unwilling to cooperate with Koyo, the burden of producing the requested information by Commerce, without exception, rests with respondent Koyo. In *Uddeholm Corp. v. United States*, 11 CIT 969, 971, 676 F.Supp. 1234, 1237 (1987), this court asserted that under 19 U.S.C. § 1677e, Commerce is not required to "assess the reasonableness" of a party's actions "in failing to provide information before proceeding to use the 'best information otherwise available' in place of the missing data." The court noted that the key to the statute is preventing "hindrance of the proceedings" and that "[r]eading such a requirement into the statute would in all likelihood severely delay a process, the timely completion of which is already difficult." 11 CIT at 971, 676 F.Supp. at 1237.

Furthermore, the United States Court of Appeals for the Federal Circuit ("CAFC") asserted that the burden of producing information lies with the respondent. In *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed.Cir.1993), the CAFC determined that "[t]he burden of production should belong to the party in possession of the necessary information." *See also Tianjin Mach. Import & Export Corp. v. United States*, 16 CIT 931, 936–37, 806 F.Supp. 1008, 1015 (1992). In addition, in *Timken Co. v. United States*, 11 CIT 786, 804, 673 F.Supp. 495, 513 (1987), this court asserted that Commerce "acts reasonably in placing the burden of establishing adjustments on a respondent that seeks the adjustments and that has access to the information." Since the respondent, Koyo, did not produce the requested information, Commerce's decision to apply BIA is reasonable and supported by law.

Koyo's contentions concerning the "Roller Chain" exclusion are also unpersuasive. Commerce's ability to establish a threshold is provided by 19 U.S.C. § 1677a(e)(3) (1988), which states that exporter's sales price will be reduced by the amount of "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise."

Furthermore, this Court, during its review of the second administrative review of Koyo, upheld the one percent threshold established by Commerce as being consistent with law. *See Koyo Seiko Co. v. United States*, 19 CIT ——, ——, 898 F.Supp. 915, 919 (1995). Thus, Koyo's claims pertaining to the "Roller Chain" exemption are without merit.

Finally, Commerce properly applied, as BIA, Koyo's rate from the LTFV investigation. In response to a questionnaire issued by Commerce, Koyo reported that six types of non-scope merchandise were manufactured by its U.S. affiliates. It calculated that one merchandise accounted for more than one percent of the value of the finished product sold at arm's length. *Koyo's Brief* at 12–13. Due to the fact that one of Koyo's merchandise exceeded one percent of the value of the finished merchandise and, therefore, was not eligible for the "Roller Chain" exclusion, Koyo was obligated to report further COP data.[3] *See 1991–92 Questionnaire*, P.R. Document No. 2 at 31. Koyo failed to report the requested information claiming that it could not obtain the information from a related company. *Koyo's Brief* at 13–14. Thus, upon Koyo's failure to provide the additional information necessary, Commerce resorted to BIA under the authorization of 19 U.S.C. § 1677e(c). Commerce stated its reasons for resorting to BIA as follows:

> While Koyo has substantially cooperated with our requests for information, it has not provided the further manufacturing information necessary to analyze sales of subject merchandise that comprised over one percent of the finished product into which they were incorporated.... Therefore, consistent with the Department's BIA policy as outlined above, we applied the second-tier BIA rate to those sales for which no information has been provided. Unlike the circumstances ... in which the Department used neutral information rather than BIA because the respondent did not have the opportunity to submit the missing data, Koyo was notified of its obligation to submit the missing further manufacturing information in the original questionnaire.... Therefore for the final re-

---

3. The public record of this administrative review is designated "P.R."

sults, we applied the second-tier BIA rate of 73.55 percent to those sales of models where the value of the bearings exceeded one percent of the value of the finished product.

*Final Results,* 58 Fed.Reg. at 39,740 (Comment 2).

As indicated by Commerce, because Koyo cooperated, Commerce applied second-tier BIA, explaining:

When a company substantially cooperated with our requests for information and, substantially cooperated in verification, but failed to provide the information requested in a timely manner or in the form required or was unable to substantiate it, we used as BIA the higher of (1) the highest rate ever applicable to the firm for the same class or kind of merchandise from either the LTFV investigation or a prior administrative review or if the firm has never before been investigated or reviewed, the all others rate from the LTFV investigation; or (2) the highest calculated rate in this review for the class or kind of merchandise for any firm from the same country of origin.

*Final Results,* 58 Fed.Reg. at 39,739.

There is no support for Koyo's claim that the application of the highest rate from the LTFV investigation is punitive. In *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191 (Fed.Cir.1993), the CAFC noted that "because Congress has 'explicitly left a gap for the agency to fill' in determining what constitutes the best information available, the ITA's construction of the statute must be accorded considerable deference" (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). Furthermore, Commerce has interpreted BIA as a rule of adverse inference which establishes a presumption that the highest prior margins are the best information available. *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190–91 (Fed.Cir.1990). This rule supports Commerce's decision to apply the LTFV rate because it would be presumed to be the best information available. Commerce's methodology has been upheld by the court, most

recently in this Court's decision concerning the second review of Koyo. *See Koyo,* 19 CIT at ——, 898 F.Supp. at 918. *See also Emerson Power Transmission Corp. v. United States,* 19 CIT ——, ——, Slip Op. 95–155 at 17–18, 903 F.Supp. 48, 56 (1995).

Thus, this Court finds that Commerce's use of BIA for Koyo's COP data is supported by substantial evidence on the agency record and in accordance with law.

### 2. *Use of best information available to compute discount adjustments*

█ Koyo contends that Commerce's use of BIA for early payment discounts and sales and freight allowances offered by American Koyo Corporation, Koyo's United States sales division, is unsupported by substantial evidence and otherwise contrary to law. *Koyo's Brief* at 27–36. Koyo asserts that it relied on Commerce's acceptance in previous reviews of information reported on a customer-specific basis. *Id.* at 30. According to Koyo, Commerce suddenly requested Koyo to change its reporting methodology to a transaction-specific basis without warning. *Id.* Koyo emphasizes that Commerce specifically approved its use of a customer-specific discount factor during the second administrative review. *Koyo's Reply Brief* at 23–24. Koyo maintains that it could not comply with the new reporting requirements within the two week time frame given by Commerce because it required the "burdensome manual review of transaction-specific data for literally thousands of sales." *Koyo's Brief* at 32.

█ Koyo further claims that the BIA rate chosen by Commerce, the highest customer-specific rate reported by Koyo for any customer receiving such discounts or allowances, is unrepresentative of virtually all sales that received these discounts or allowances. *Id.* at 34. As a result, Koyo contends that Commerce's use of a "wildly aberrant rate" as BIA for Koyo's sales and freight allowance "bears no 'rational relationship' to sales to which this discount was in fact applied." *Id.* at 35 (quoting *Manifattura Emmepi S.p.A. v. United States,* 16 CIT 619, 624, 799 F.Supp. 110, 115 (1992)).

In response, Commerce claims that it properly used BIA pursuant to 19 U.S.C. § 1677e(c) and 19 C.F.R. § 353.37(a) (1993). *Commerce's Brief* at 20–21. Commerce argues that it gave Koyo fair warning in a deficiency letter, dated November 4, 1992, to change its methodology to a transaction-specific basis. *Id.* at 21–22. In addition, Commerce asserts that Koyo had at least one month to comply with Commerce's request. *Id.* at 22. Commerce claims that it only resorted to BIA after "Koyo demonstrated complete lack of will to even make a good faith effort to respond to Commerce's request for information." *Id.* Commerce also asserts that it may change its practice as long as there is a reasonable basis for the change, as is the case here. *Id.* at 23–24. Commerce further emphasizes that Koyo did not detrimentally rely on the existing methodology. *Id.* at 24.

Commerce applied BIA as follows:

We required U.S. discounts to be reported on an actual transaction-specific basis ... because any allocation of discounts would dilute the discounts actually received on particular sales. Therefore, as BIA for early payment discounts (Discount 1), we have applied the highest early payment discount rate offered by Koyo on all of Koyo's U.S. sales receiving this discount. As BIA for Koyo's sales and freight allowance discount (Discount 2), we have applied to all U.S. sales receiving this discount the highest customer-specific discount factor reported by Koyo.

*Final Results*, 58 Fed.Reg. at 39,762–63. Commerce maintains that it properly exercised its discretionary authority by applying the highest customer-specific allowance rate reported by Koyo as BIA. *Commerce's Brief* at 27. According to Commerce, the "rational relationship" test cited by Koyo was satisfied since Commerce used as BIA a rate from Koyo's most current information on the record. *Id.*

In support of Commerce, Federal–Mogul adds that Koyo actually had at least one year to comply with Commerce's request for transaction-specific reporting. *Federal–Mogul's Brief* at 16. Federal–Mogul explains that Commerce announced its revised policy in the second review by asserting that any discount, rebate, or price adjustment data that is not reported on a transaction-specific basis will be subject to BIA. *Federal–Mogul's Brief* at 14 (citing *1990/91 Final Results*, 57 Fed.Reg. at 28,400). Torrington also essentially supports Commerce's use of BIA to calculate the adjustment for Koyo's discounts and allowances. *Torrington's Brief* at 25–28.

■ Commerce's decision to resort to BIA was consistent with both 19 U.S.C. § 1677e(c) and 19 C.F.R. § 353.37(a).[4] After Koyo had submitted information on a customer-specific basis in a completed questionnaire on September 28, 1992, Commerce issued a deficiency letter on November 4, 1992, requesting Koyo to "resubmit its early payment discounts on a transaction-specific basis." *Supplemental Questionnaire*, P.R. Document No. 256 at 3. Koyo responded to the deficiency letter on November 18 and December 4, 1992. Whether Commerce initially gave Koyo two weeks or one month to respond is irrelevant since Koyo admits that after one month had passed it still failed to provide Commerce with the information on a transaction-specific basis. *Koyo's Brief* at 30–32. The only real issue before the Court is whether Commerce possessed the authority to change its reporting methodology for the third administrative review.

In *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 388, 795 F.Supp. 417, 422 (1992), the court ruled that Commerce acted beyond its discretionary powers by changing its methodology for the fifth and sixth antidumping administrative reviews after using a different methodology for the first four, even though the new methodology was likely to be a slight improvement. The court held that

---

**4.** 19 C.F.R. § 353.37(a) instructs the Secretary to use BIA whenever Commerce:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

"[a]t some point, Commerce must be bound by its prior actions so that parties have a chance to purge themselves of antidumping liabilities" 16 CIT at 387, 795 F.Supp. at 421. The court noted, however, that this obligation is not absolute because "[a]dherence to prior methodologies is [only] required in *some* circumstances." (emphasis added) *Id.* at 387, 795 F.Supp. at 421.

The facts of the present case are distinguishable from *Shikoku*. In *Shikoku*, Commerce changed its methodology after four administrative reviews. In the case at bar, Commerce adopted the new methodology for the third administrative review. Furthermore, while Koyo is correct to emphasize that Commerce accepted Koyo's method of reporting during the first two administrative reviews, Koyo fails to recognize that Commerce's policy in general began to shift before the third administrative review. As Federal–Mogul indicates, during the second administrative review Commerce stated its intention to change its policy as follows:

> The Department has treated home market discounts, rebates and price adjustments as direct expenses if they could be traced on a transaction-specific basis. . . . Although we allowed customer-specific allocations on home market sales in the first reviews, we have reconsidered our position and decided to allow only price adjustments which were tied to specific sales under comparison. In this way, we avoid applying reductions to FMV for sales that did not actually incur those reductions.

> The Department deducted all U.S. discounts, rebates, or price adjustments as direct expenses. If these expenses were not reported on a transaction-specific basis, we used BIA for the expense.

*1990/91 Final Results,* 57 Fed.Reg. at 28,400. This statement should have at least put Koyo on notice of an impending change in Commerce's treatment of Koyo's reporting methodology in subsequent reviews. Therefore, Koyo's reliance on Commerce's acceptance of Koyo's reporting practices during the second administrative review is unjustified. The above statement illustrates that the "last minute change in methodology" that existed

in *Shikoku* is not present here. 16 CIT at 388, 795 F.Supp. at 422.

In addition, Koyo fails to demonstrate that the methodology adopted by Commerce is only a slight improvement over the old methodology. Commerce asserts transaction-specific data leads to more accurate adjustments to USP for a particular entry. *Commerce's Brief* at 23. According to Commerce, allocating discounts for particular entries across all entries of a customer diminishes the amount of the discount from USP on any single entry. *Id.* In this manner, customer-specific reporting may result in masked dumping. *Id.* at 24. Koyo argues that "[f]rom a business standpoint . . . it is the *average* discount and allowance experience with an individual customer that serves as the best measure a business has for setting prices with that customer." *Koyo's Reply Brief* at 26. The Court is unpersuaded by Koyo's response. Koyo's contention that customer-specific reporting is more accurate from a business standpoint is irrelevant. While customer-specific reporting may be the best method for setting prices with respect to a particular *customer*, it may not be the best method for determining dumping margins for a particular *entry*. Thus, Commerce has demonstrated that the change in methodology is more than a slight improvement for the purpose of calculating accurate dumping margins.

This Court also finds Commerce's choice of BIA appropriate. The Court has already noted Commerce's broad discretionary power in determining what constitutes the best information available. *See discussion, supra* at 14–15. Koyo cites *Manifattura,* 16 CIT at 624, 799 F.Supp. at 115 for the proposition that Commerce's "authority to select best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply." In *Manifattura* the court held that although Commerce was entitled to resort to BIA, ten-year-old cash deposit rate information from the original investigation in which the exporter was not involved did not suffice. 16 CIT at 624, 799 F.Supp. at 110.

The facts of the present case differ from *Manifattura* where the plaintiff claimed " 'there was *no* unity of parties, *no* unity of

timeframes, *no* unity of the administrative agencies involved, and *no* unity of law.'" 16 CIT at 624, 799 F.Supp. at 115. Koyo cannot assert the same claims since all of the above "unities" exist in the present case. The rate chosen by Commerce is not outdated but, rather, is based on information contained in Koyo's most recent questionnaire responses. *See Final Results,* 58 Fed.Reg. at 39, 762–63. As such, Commerce acted within its discretionary powers under both 19 U.S.C. § 1677e(c) and 19 C.F.R. § 353.37(a) in applying BIA to compute discount adjustments.

In sum, Commerce's use of BIA is supported by substantial evidence and is otherwise in accordance with law.

### Conclusion

In accordance with the foregoing opinion, this Court, after due deliberation and a review of all papers in this case, finds that Commerce's actions were in accordance with law and supported by substantial evidence. For the reasons stated above, the Final Results are affirmed and plaintiffs' motion is denied in all respects. This case is hereby dismissed.

### JUDGEMENT

This case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that plaintiffs' motion for judgment on the agency record is denied in all respects and that Commerce's determination is affirmed in all respects; and it is further

**ORDERED** that this case is hereby dismissed.