**AK STEEL CORP., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Union Steel Manufacturing Co., Ltd., Defendant–Intervenor.**

Slip Op. 97–160.
Court No. 96–05–01441.

United States Court of
International Trade.

Dec. 1, 1997.

Dewey Ballantine (Michael H. Stein, Bradford L. Ward, Guy C. Smith, Elizabeth A.B. McMorrow, Jennifer Danner Riccardi), Washington, DC, for Plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice, John D. McInerney, Deputy Chief Counsel, Bernd Janzen, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, Washington, DC, for Defendant.

Hogan & Hartson, L.L.P. (Raymond S. Calamaro, Lewis E. Leibowitz, Steven J. Routh, Lynn Kamarck), Washington, DC, for Defendant–Intervenor.

### OPINION

POGUE, District Judge.

Plaintiffs, A.K. Steel Corp. et al. ("A.K.Steel") and Union Steel Manufacturing Comp. Ltd. ("Union"), filed separate actions challenging aspects of the International Trade Administration's final results in *Certain Corrosion–Resistant Carbon Steel Flat*

*Products from Korea,* 61 Fed.Reg. 18,547 (Dep't. Commerce 1996)(final results admin. review)[hereinafter Final Results]. The two actions were consolidated.

The Court has jurisdiction under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A).

## BACKGROUND

In August 1993, Commerce issued antidumping duty orders on cold-rolled carbon steel products from Korea. *Certain Cold–Rolled Carbon Steel Flat Products from Korea,* 58 Fed.Reg. 44,159 (Dep't.Commerce, 1993) (antidumping duty ords.). Commerce determined that the weighted-average dumping margin for corrosion-resistant ("CORE") steel products was 17.70 percent for all importers. *Id.*

In September 1994, pursuant to the requests of Union and other Korean steel producers,[1] Commerce initiated the first administrative review of CORE and cold-rolled steel products from Korea. *Certain Cold–Rolled Carbon Steel Flat Products from Korea,* 59 Fed.Reg. 46,391 (Dep't.Commerce, 1994) (init. antidumping and countervailing duty admin. reviews). The schedules for the CORE and cold-rolled reviews diverged in May 1995, when Commerce, at the request of the petitioners, decided to "collapse" Union and a related party, Dongkuk Industries Co., Ltd. ("DKI"), for purposes of the cold-rolled review.[2] As a result, Union submitted a new response for the cold-rolled review, consolidating the sales and cost information of Union Steel and DKI. The period of review for sales of CORE steel products was February 4, 1993 to July 31, 1994.

In September 1994 Commerce sent a questionnaire to Union requesting general information about the company; home market and third country sales data; and U.S. sales data.[3] Commerce requested that Union assign control numbers to each class or kind of merchandise and that Union categorize U.S. and home market sales information based upon eleven criteria, i.e., physical characteristics. These characteristics were (1) type, (2) metallic coating process, (3) clad material/coating metal, (4) quality, (5) yield strength, (6) metallic coating weight, (7) minimum thickness, (8) width, (9) form, (10) temper rolling, and (11) levelling. The eleven categories were further divided into subcategories. The criteria were to serve as the basis for assigning control numbers ("CON-NUMs") to Union's CORE sales.[4] These characteristics were listed in descending order of importance. Respondents were instructed first to match home-market sales of the same "type," (meaning clad or coated, painted or unpainted) as U.S. sales. Where that was accomplished, respondents were instructed to move down the list until it was no longer possible to find home-market sales that matched U.S. sales with respect to a particular characteristic.

The purpose of this exercise was to identify home-market sales of identical or at least similar merchandise. *See* 19 U.S.C. § 1677b(a)(1) ("The foreign market value of imported merchandise shall be the price . . . at which such or similar merchandise is sold . . . in the principal markets of the country from which exported . . . ."). Where it was not possible to match every model characteristic, the Department made difference in merchandise ("difmer") adjustments for cost differences between similar merchandise to permit appropriate comparison.

1. The other Korean steel producers subsequently withdrew their requests.

2. When Commerce "collapses" parties during an investigation it treats them as a single entity and calculates a single dumping margin for them. *See Queens Flowers de Colombia v. United States,* 981 F.Supp. 617 (CIT 1997). Commerce's collapsing decision is not at issue in this case.

3. During an administrative review, Commerce compares U.S. price to foreign market value in order to calculate a dumping margin. Foreign market value may be based upon prices in the home market, price to third countries, or upon constructed value. 19 U.S.C. §§ 1675, 1677a, 1677b (1988).

4. By comparing the physical characteristics of Union's U.S. sales—represented by CONNUMU (control number for U.S. sales)—with the physical characteristics of Union's home-market (Korean) sales—represented by CONNUMH (control number for home market sales)—Commerce can identify the identical CORE product, or, if an identical CORE product is not available, the most similar CORE product for comparison with the imported product.

Commerce then sought to verify the data supplied by Union. On March 13, 1995, Commerce sent Union a verification agenda. In the agenda, Commerce advised Union to be prepared, *inter alia,* (1) to discuss product characteristics of the merchandise at issue in relation to the characteristics identified in the questionnaire, and (2) to demonstrate that the product characteristics shown in its home market and U.S. sales listings were reported correctly. Commerce Verification Outline at 5–6 (Pub.Doc. 184) Commerce stated that Union should explain and document, as appropriate, the process used in deriving the criteria for each product, and provide copies of specification and other relevant documents such as "[m]ill certificates, invoices, product brochures that support [its] categorization of products under each model match variable...." *Id.* at 6.

On May 16, 1995, Commerce issued its sales verification report. In the "Product Comparison" section, the report said that Union maintained "an internal seven-digit product code assigned to all products that was used to define the majority of the model match variables in submission for cold-rolled and corrosion-resistant flat products." Commerce Sales Verification Rep. at 16 (Pub.Doc. 222). Union supplied Commerce verifiers with mill/inspection certificates of Union's preselected U.S. sales to verify the product code system, but told Commerce verifiers that it no longer had copies of any mill/inspection certificates of its home-market sales for the period of review. The verification report stated that due to Union's failure to provide mill/inspection certificates Commerce was able to verify some but not all of the relevant product characteristics for home-market sales of Union's CORE products.

In August 1995, Commerce issued its preliminary results. *Certain Corrosion–Resis-*

*tant Carbon Steel Flat Products from Korea: Preliminary Results of Antidumping Duty Administrative Review,* 60 Fed.Reg. 44,006 (Dep't. Commerce 1995)(prelim.results). Due to its inability to verify product characteristics for Union's home-market sales, Commerce used Union's model-matching product comparisons but applied to all of Union's price-to-price comparisons an across-the-board adjustment for differences in physical characteristics of twenty percent as the best information available ("BIA").[5]

Between April 10 and April 14, 1995, Commerce verified Union's cost of production and constructed value information. The constructed value of imported merchandise equals:

the sum of—

(A) the cost of materials ... and of fabrication or other processing ...;

(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration ...

(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise under consideration in condition, packed ready for shipment to the United States.

19 U.S.C. § 1677b(e). Because this information was verified successfully, Commerce decided to use constructed value as the basis for foreign market value in its final results, pursuant to 19 U.S.C. § 1677b(a)(2).[6] However, Commerce resorted to BIA for the profit component of constructed value, pursuant to its authority under 19 U.S.C. § 1677e(b) which requires that if Commerce is unable to verify the accuracy of information submitted, "it shall use the best information available to it as the basis for its ac-

---

**5.** Twenty percent is the maximum difference in merchandise ("difmer") Commerce allows between U.S. and home-market models for the purposes of comparison. *See Certain Welded Carbon Steel Pipe and Tube from Turkey,* 61 Fed.Reg. 69,067, 69,076 (Dep't. Commerce 1996)(final results admin. review)(citing Import Administration Policy Bulletin: Number 92.2, July 28, 1992, Differences in Merchandise; 20 percent rule). *See also Granular Polytetrafluoroethylene Resin*

*from Italy,* 60 Fed.Reg. 53,737, 53,738 (Dep't. Commerce 1995)(final results admin. review).

**6.** 19 U.S.C. § 1677b(a)(2) states in relevant part, "[i]f the administering authority determines that the foreign market value of imported merchandise cannot be determined [based on home-market sales] then, ... the foreign market value of the merchandise may be the constructed value of that merchandise...."

tion, . . . ." Commerce was unable to verify Union's profit figures, just as it was unable to verify the physical characteristics of Union's home market sales, because verifiers were unable to match specific sales to specific costs due to their inability to verify the accuracy of Union's internal product code.

In its case brief filed on October 2, 1995, Union argued that partial BIA was unwarranted since its reported home market product characteristics had been adequately verified.[7]

Commerce rejected certain materials in Union's case and rebuttal briefs related to Commerce's verification of Union's home-market product code system. Commerce said it was deleting the materials from the administrative record because they constituted untimely submitted factual information. *Final Results*, 61 Fed.Reg. at 18,560. According to Commerce's regulations, factual information for an administrative review is to be submitted not later than "the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review." 19 C.F.R. § 353.31(a)(1). When Union submitted its case brief, both regulatory deadlines for submitting factual information had elapsed.[8]

Union Steel objects to the following aspects of Commerce's final results:

1) the decision to rely on constructed value rather than home-market sales in calculating foreign market value;

2) Commerce's decision to strike from the administrative record portions of Union's case brief and rebuttal brief;

3) the use of BIA for the profit component of the constructed value calculation, rather than the profit information submitted by Union;

4) Commerce's method for calculating profit as partial BIA.

Domestic producers object to the following aspects of the final results:

1) the use of partial rather than total BIA in calculating the dumping margin;

2) Commerce's decision not to deduct countervailing and antidumping duties from United States price in calculating Union's dumping margin.

Union's memorandum to this Court contains references to the material that Commerce decided to strike from the administrative record. Union requests that if the administrative record does not compel entry of judgment for Union, that the Court supplement the record and grant summary judgment to Union based on the supplemented record. Defendant filed a motion requesting that the Court strike these matters from Union's brief.

## DISCUSSION

### *UNION'S ISSUES*

#### I. *Commerce's Rejection of Home–Market Sales as the Basis for Foreign Market Value*

"During the verification of Union's responses, the Department was unable to fully verify the accuracy of Union's reported home-market product characteristics because Union did not retain the relevant information in its records." *Certain Corrosion–Resistant Carbon Steel Flat Products from Korea,* 60 Fed.Reg. 44,006 (Dep't. Commerce 1995) (prelim. results admin. review). Because Commerce was unable to verify the product characteristics of Union's home market sales, the Department based foreign market value on constructed value.

---

7. The pertinent Commerce regulation, 19 C.F.R. § 353.38 (1995) provides for the submission of a "case brief" after the date of publication of the preliminary results, and of a rebuttal brief after the filing of the case brief. "The case brief shall separately present in full all arguments that continue in the submitter's view to be relevant to the . . . final results, including any arguments presented before the date of publication of . . . the preliminary results." 19 C.F.R. § 353.38(c)(2). "The rebuttal brief is to separately present in full

all rebuttal arguments, responding only to arguments raised in the case brief." 19 C.F.R. § 353.38(d).

8. The preliminary results were published on August 24, 1995. The notice of the initiation was published on September 8, 1994. One hundred and eighty days from the date of the initiation would have been March 7, 1995.

■ Union argues that Commerce's refusal to accept the accuracy of Union's product code for home-market sales was unreasonable. During verification, Union states, Commerce tied the product codes from Union's submission to Commerce to the product codes used on commercial invoices maintained in the normal course of business; traced data from the commercial invoices into Union's sales ledgers, the source data for the submitted product codes; compared the meaning of the product code key in Union's production manual maintained in the normal course of business, and found no discrepancies; and, checked the reported product characteristics against mill certificates for U.S. sales during the period of review. (Union Steel Rebuttal Br. at 4–5) (Pub.Doc. 312). The information received by Commerce in taking these steps, Union argues, "well exceeded the threshold of 'such relevant evidence as a reasonable mind might accept as adequate.'" Union Mot. for J. Agency Rec. at 46 ("Union Mot.")(quoting *Micron Technology v. United States,* 893 F.Supp. 21, 40–41 (CIT 1995) *aff'd,* 117 F.3d 1386 (Fed.Cir. 1997)). Furthermore, Union argues, "[b]ecause Commerce's refusal to accept as verified Union's product code system and 'model match' characteristics for home-market sales was both unsupported by substantial evidence and arbitrary, Union is entitled to Judgment on the Agency Record, . . . ." Union Mot. at 48.

The Court does not agree. In reviewing the final results of an administrative review, the Court of International Trade must decide whether Commerce's determination is in accordance with law and whether Commerce's conclusions are supported by substantial evidence on the record. Section 516a(b)(1)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(b)(1)(B)(i)(1988).

The statute requires that Commerce verify all information relied upon in making a review and determination, if "(A) verification is timely requested by an interested party . . . and (B) no verification was made . . . during the 2 immediately preceding reviews and determinations . . . of the same order, finding, or notice . . . ." 19 U.S.C. § 1677e(b). The

statute does not specify the means by which verification is to be accomplished.

"[I]f the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). With respect to verification, "Congress has afforded ITA a degree of latitude in implementing its verification procedures . . . If a reasonable standard is applied and the verification is supported by substantial evidence, the court will sustain the methodology." *Floral Trade Council v. United States,* 17 CIT 392, 399, 822 F.Supp. 766, 772 (1993) (citations omitted); *see also American Alloys, Inc. v. United States,* 30 F.3d 1469, 1475 (Fed.Cir.1994) ("[T]he statute gives Commerce wide latitude in its verification procedures.").

The steps taken by Commerce in attempting to verify Union's home-market data were sufficient to fulfill Commerce's statutory mandate. Commerce informed Union in advance that it would need to verify Union's reported product characteristics and told Union the type of documentation that would be required to accomplish this. Commerce verifiers visited Union's worldwide headquarters in Seoul, Korea, and its California office in Torrance, California. They requested and received an explanation of Union's product code as well as mill/inspection certificates of preselected U.S. sales. Sales Verification Report, May 16, 1995 at 16–17 (Pub.Doc. 222). As Union points out, Commerce also examined Union's commercial invoices, traced data from the commercial invoice into Union's sales ledgers, and examined the product code key in Union's production manual. Union Mot. at 39–42. Finally, Commerce gave Union the opportunity to comment on its verification report. Thus, Commerce provided Union with ample opportunity to present documentation relevant to Commerce's verification.

After weighing the evidence obtained during the verification process, Commerce concluded that Union had failed to provide

enough evidence to verify its product characteristics for home market sales. Union disagrees with this conclusion and is asking the Court to reweigh the evidence before Commerce. However, "[t]he function of this Court is not to reweigh the evidence, but rather to ascertain whether [Commerce's] determination is 'unsupported by substantial evidence on the record....'" *Metallverken Nederland B.V. v. United States*, 13 CIT 1013, 1017, 728 F.Supp. 730, 734 (1989).

Here, record evidence demonstrates that at verification, Union failed to provide documentation that directly tied its home-market sales to its production records. Specifically, Union did not preserve production records for its home-market sales, such as mill certificates, which would have connected specific products to specific sales. *See* Final Results at 18,559; Letter of June 8, 1995 from Sidley & Austin to Commerce at 10, Pub. Doc. 242 ("[P]articular shipments cannot be tied to particular production runs; there is no cross-reference between the production and commercial systems for home market sales."). Commerce verifiers also found that Union did not explain how it categorized its home-market sales for yield strength or temper-rolled model-match criteria. *See* Sales Verification Report at 17.

Union argues that in past cases Commerce has relied on commercial invoices to verify product codes and that it could have done so in this case as well. However, after examining Union's commercial invoices, Commerce chose to rely on other evidence that indicated that Union's home-market sales information was unverifiable.

Because Commerce's verification methodology was reasonable, and the decision to reject Union's home-market sales information was supported by substantial evidence, the Court will sustain Commerce's decision.

## II. The Deletion of Sections of Union's Case and Rebuttal Briefs

■ After publication of the preliminary results of Commerce's investigation, Union submitted a case brief and a rebuttal brief. Both briefs contained, *inter alia*, references to documents Union says Commerce could have used to verify Union's home market

sales information. Commerce stated that it deleted these references on the grounds that they constituted "new factual information within the meaning of section 353.31(a)(3) of the Department's regulations [19 C.F.R. § 353.31]." Final Results at 18,560. Union disagrees with Commerce's characterization of these materials.

The materials at issue include references by Union to post-POR "mill inspection cards" examined by Commerce inspectors to verify Union's date of sale information and references to inventory records examined by Commerce to verify Union's reported cost and freight information. With regard to the inventory records, Union argued as follows:

The record demonstrates that Union's product coding is used for Union's inventory records.... Since each shipment has a matching inventory withdrawal, the Department could have tied the product code shown in the commercial documentation to the product code shown in the inventory data bases....

From here, it would have been a simple further step to tie from inventory withdrawals to entries into finished goods inventory .... then, the Department could have traced to production records, such as the inspection cards and the daily production reports, to confirm the nature of the products.

Union's Case Brief at 20–21.

Commerce also decided to delete Section IIIA of Union's case brief in its entirety, as well as references to Section IIIA in Union's rebuttal brief. In Section IIIA, Union describes each of the characteristics relied upon by Commerce in making its model match, and explains how these characteristics can be derived from its commercial records, disputing Commerce's contention that a majority of the characteristics were derived from the internal product code.

Finally, Commerce deleted references to information received by Commerce at the DKI verification in August 1995.

Union objects to Commerce's deletions on the ground that the materials at issue constituted "arguments or explanations that merely identified and elaborated on the signifi-

cance of factual information that already was in the record before Commerce," and that "[b]oth the Court and Commerce have acknowledged that § 353.31 should not be used to bar supplementary submissions that merely clarify record evidence or put such information 'in a format that Commerce is more likely to accept.'" Union's Mot. at 54 (citing Bowe–Passat v. United States, 17 CIT 335, 1993 WL 179269 (1993)).

The Court agrees with Union that other than the references to the DKI investigation, the materials did not constitute newly submitted factual information. Rather, the materials constitute a reinterpretation by Union of evidence that was before Commerce during its investigation. Therefore, Commerce's decision to delete these materials from Union's submissions was a procedural error. Commerce's antidumping procedures permit interested parties to submit a case brief after publication of the preliminary results presenting "all arguments that continue in the submitter's view to be relevant. . . ." 19 C.F.R. § 353.38(c)(2). However, the record demonstrates that while Commerce stated that it deleted the materials at issue, it actually addressed Union's arguments. For example, Commerce notes that Union submitted a consultant's report stating that Union's production and inventory records are inaccurate. Final Results at 18,559. "[T]his calls into question the possibility of successfully employing the alternative techniques Union is now advocating." Id. Similarly, with respect to Union's statements regarding Union's inventory records, Commerce explains that "these documents . . . do not clearly demonstrate on their own that 'the internal code is used in the production process,' because they are not documents generated in the course of the production process." Commerce Letter of April 12, 1996; Pub. Doc. 370.

■ Finally, Union's argument that the majority of its product characteristics were not derived from the product code and that "[t]he Department's apprehension is limited to product characteristics that were defined based on the product code," Union Rebuttal Brief at 21 (Pub.Doc. 312), is irrelevant. Whether Union submitted six unverifiable product characteristics, or five, or even three or four, Commerce's rejection of Union's home-market sales information here would have been within its discretion.

Moreover, Commerce acknowledged Union's argument in the Final Results, stating, "Union claims that the majority of the reported product characteristics are not derived from the internal product code." 61 Fed.Reg. at 18,557. Commerce addressed Union's claim, explaining, "the internal product code . . . was the basis for a majority of the variables, rather than just the five referenced by respondent. In fact, five of the six most important variables in the model-match hierarchy were derived from the internal product code, and Union's methodology for categorizing an additional variable (Yield strength) on specific sales was not explained to the Department." Id. at 18,559.

■ Thus, although Commerce said it was deleting the materials at issue, the Final Results demonstrate that Commerce actually treated these materials as part of the administrative record. Commerce considered and reasonably rejected Union's arguments. Commerce erred in characterizing the materials at issue as newly submitted factual information and stating, officially, that the materials were deleted from the administrative record. However, in fact, Commerce considered and responded to the materials, so Union's interests were not prejudiced by Commerce's procedural error and therefore the error was harmless. "It is well settled that principles of harmless error apply to the review of agency proceedings." Intercargo Insurance Co. v. United States, 83 F.3d 391, 394 (Fed.Cir.1996). See Sea–Land Serv., Inc. v. United States, 14 CIT 253, 257, 735 F.Supp. 1059, 1063 ("[I]t is . . . well settled that courts will not set aside agency action for procedural errors unless the errors 'were prejudicial to the party seeking to have the action declared invalid.'"), aff'd and adopted, 9 Fed. Cir. (T) 59, 923 F.2d 838 (1991). Because Commerce's error was harmless, the Court will not remand for Commerce to do officially what it has already done in actuality.

■ As for the information from the DKI investigation "[t]he record for judicial review should ordinarily not contain material from separate investigations." *Bethlehem Steel Corp. v. United States,* 5 CIT 236, 236, 566 F.Supp. 346, 347 (1983); *see also Win–Tex Products v. United States,* 16 CIT 760, 762–63, 797 F.Supp. 1025, 1027 (1992). Union argues, based on the holding in *Floral Trade Council v. United States,* 13 CIT 242, 709 F.Supp. 229 (1989) that the DKI verification exhibits should be made part of the record of this investigation. In *Floral Trade Council,* the court said, "[t]he court may, ... find documents from [earlier] investigations to be part of the record for purposes of review...." 13 CIT at 244, 709 F.Supp. at 231. However, the court also "wholeheartedly [recognized] the law from earlier cases indicating that documents obtained for other investigations do not automatically become part of the record of related investigations." *Id.* at 243, 709 F.Supp. at 230. The reason the court was willing to make information from related investigations part of the record in *Floral Trade Council,* was that the agency stated in its final results, that it had examined "the original investigations by the ITC and the Department." *Id.* "[T]hose documents at the agency which become sufficiently intertwined with the relevant inquiry are part of the record, no matter how or when they arrived at the agency.... The question to be asked is whether the decision can be reviewed properly without certain documents." *Id.* In this case, Commerce made no reference in the Final Results to documents gathered as part of the DKI investigation. Therefore, the Court finds, the documents from that investigation were not "sufficiently connected to the current investigation to be considered to be before the agency for purposes of the decision at issue." *id.* at 244, 709 F.Supp. at 231, and Union's references to the DKI investigation were appropriately deleted.

### III. Commerce's Decision to Resort to Partial BIA in Calculating Foreign Market Value.

■ Because Commerce was unable to verify the accuracy of Union's product code for home-market sales, Commerce used constructed value for calculating foreign market value. According to the statute, "[i]f the administering authority determines that the foreign market value of imported merchandise cannot be determined [based on home-market sales] then, ... the foreign market value of the merchandise may be the constructed value of that merchandise...." 19 U.S.C. § 1677b(a)(2).

The definition of constructed value provides that "the amount for profit shall not be less than 8 percent of the sum of [the] general expenses and cost," 19 U.S.C. § 1677b(e). The profit margin reported by Union to Commerce was less than eight percent. Usually, in such a case, Commerce would use the statutory eight-percent minimum for Union's profit margin. However, because Commerce was unable to verify Union's home-market product characteristics, Commerce was also unable to verify Union's reported profit margin for home-market sales. Specifically, without verifying Union's home-market product characteristics, Commerce was unable to match specific sales to specific costs. Therefore, Commerce used as partial BIA a calculated profit margin that was more adverse than the statutory eight-percent minimum.

Union claims that Commerce's decision to resort to partial BIA in lieu of information submitted by Union, which would have required use of the statutory minimum, was "fundamentally unfair" because Commerce failed to give Union clear notice and a meaningful opportunity to respond to Commerce's concerns regarding the accuracy of Union's product code system.

The Court cannot agree. In *Thyssen Stahl v. United States,* 886 F.Supp. 23, 26 (CIT 1995), the plaintiff argued that if Commerce deemed certain missing documents essential to verification, it should have requested those documents either in the sales verification outline provided to the respondent prior to verification, or after verification but prior to making its determination. The court agreed with Commerce in that case, that Commerce is "not required to itemize beforehand every possible type of document needed during verification,...."

Furthermore, the court agreed that, "the ITA is not required to request that missing information be provided at a future date." *Id.*

Union was aware, prior to verification, that Commerce would want to verify Union's model match characteristics. *See* Sales Verification Outline at 6 (Pub.Doc. 184). As Commerce points out in the Final Results, if Union had documentation that it thought would help Commerce to accomplish this, it could have brought it to Commerce's attention during verification.

> Only the respondent is in a position to know what documentary evidence there exists in its possession; it is the respondent's responsibility to determine prior to the verification, what documentary evidence exists in its records supporting the information previously supplied to the Department, and to provide such documentary evidence to the Department's verifiers.

61 Fed.Reg. at 18,559.

Union also contends that it cooperated fully with Commerce, both in responding to the questionnaire and at verification. Therefore, Union argues, "Commerce cannot resort to the type of punitive BIA used in this case...." Union Mot. at 57. Union relies on 19 U.S.C. § 1677e(c) as support for its position. According to that provision, "the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information *requested* in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." (emphasis added). Union argues,

> the only information or documents ever requested by Commerce but not produced by Union were customer correspondence and mill certificates for Union's home-market sales, and Commerce has acknowledged that those documents simply do not exist. Commerce cannot resort to the type of punitive BIA used in this case where a respondent is unable to produce requested documents because they do not exist.

Union Mot. at 57.

Commerce acknowledges that Union cooperated fully with its investigation. However,

Union ignores a second BIA provision which requires that if the administering authority is unable to verify the accuracy of the information submitted, "it *shall* use the best information available to it as the basis for its action,...." 19 U.S.C. § 1677e(b) (emphasis added). Commerce was unable to verify information submitted by Union. Therefore, its decision to apply BIA was consistent with the statute.

### IV. Commerce's Methodology for Calculating BIA

As BIA, Commerce calculated the weighted-average profit for all of Union's above-cost home-market sales. In order to determine which sales were above the cost of production, Commerce calculated a simple average cost of production based on all home-market sales. Commerce compared the simple average cost of production to each individual home-market sale to determine which sales were made at prices above the cost of production.

Commerce then calculated transaction-specific profit by calculating the sales value of each home-market transaction (i.e., net price times sales quantity); Commerce then subtracted the value of the cost of production for that transaction to determine the transaction-specific profit (i.e., sales value minus simple average cost of production times sales quantity). Finally, Commerce weight-averaged the transaction-specific profits to derive an overall profit percentage for use in the constructed value calculation. *See* Final Results, 61 Fed.Reg. at 18,560.

Union argues that Commerce's BIA formulation was inconsistent with statutory authority and excessively punitive. Union notes that because the cost the Department used for comparison purposes was the simple average cost of production of all home-market CORE sales, Commerce attributed greater profit to more costly subject merchandise which sells at a higher price than average subject merchandise. Commerce also excluded less costly subject merchandise from its profit calculation, since the sales value of such merchandise was less than the simple average cost of all subject merchandise. As

a result, the profit margin calculated by Commerce was higher than that reported by Union.

■■■■ With respect to BIA, the courts have found that Congress explicitly left a gap for the agency to fill, and thus, it is within Commerce's discretion to decide what constitutes best information available in a particular case. *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191–92 (Fed. Cir.1993). Therefore, this Court must grant Commerce considerable deference in this area. *NTN Bearing Corp. of America v. United States,* 924 F.Supp. 200, 206 (CIT 1996). *aff'd,* 127 F.3d 1061 (Fed.Cir.1997). At the same time, "Commerce must be reasonable in its application of its chosen methodology.... A rational relationship must exist between the 'data chosen and the matter to which they are to apply.'" *National Steel Corp. v. United States,* 18 CIT 1126, 1132, 870 F.Supp. 1130, 1136 (1994) (quoting *Manifattura Emmepi S.p.A. v. United States,* 16 CIT 619, 624, 799 F.Supp. 110, 115 (1992)).

Union argues that Commerce should not have excluded below-cost sales in calculating Union's profit margin. As support for this argument, Union cites two administrative reviews in which Commerce declined to exclude below-cost sales in calculating the profit component of constructed value.[9] Union Mot. at 61. However, Union fails to recognize that in the cited cases, Commerce was relying on verified information, whereas in this case, Commerce is relying on partial BIA. As Commerce explained in the final results, "where verified data were not available, we resorted to partial BIA, still using Union's data but in a more adverse manner than if the data in question had not failed to verify.... As the Department has previously noted, 'the noncomplying respondent cannot find itself in a better position as a result of failing to comply with the Department's information request than had the respondent provided the Department with complete, ac-

curate and timely data.'" Final results at 18,560 (citing, inter alia, *National Steel Corp.,* 18 CIT at 1132, 870 F.Supp. at 1135 (1994)).

Commerce's explanation is reasonable and consistent with relevant case law as well as the overall purpose of the BIA provisions. *See Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 18 CIT 906, 915, 865 F.Supp. 857, 865 (1994) (finding that Commerce's application of adverse BIA was appropriate because, "[t]he purpose of the BIA provision is to induce respondents to provide Commerce with timely, complete and accurate information....."), *aff'd,* 68 F.3d 487, 1995 WL 596834 (Fed.Cir.1995).

In *Koyo Seiko Co. v. United States,* 905 F.Supp. 1112 (CIT 1995), the respondent reported information about early-payment discounts on a customer-specific basis although Commerce had asked that the information be reported on a transaction-specific basis. Therefore, Commerce resorted to BIA, using "the highest early payment discount rate offered by Koyo on all of Koyo's U.S. sales...." *Id.* at 1119. The respondent objected, claiming that the BIA rate chosen by Commerce was unrepresentative of "virtually all sales that received these discounts or allowances." *Id.* at 1118. Therefore, respondent complained, Commerce's BIA rate bore no "rational relationship" to sales to which the discount was applied. The court, however, noting Commerce's "broad discretionary power in determining what constitutes the best information available," disagreed. *Id.* at 1120. Commerce's BIA rate was based on information contained in respondent's most recent questionnaire responses, the court explained. Furthermore, the court noted, the case was distinguishable from *Manifattura Emmepi S.p.A. v. United States,* 16 CIT 619, 799 F.Supp. 110 (1992), in which the court struck down Commerce's use of a ten-year-old cash deposit rate from the

---

9. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom,* 58 Fed.Reg. 39,729, 39,752 (Dep't. Commerce 1993)(final results antidumping duty admin. rev. and revocation in part antidumping duty ord.), *Tapered*

*Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan, Final Results of Review,* 58 Fed.Reg. 64,720, 64,728 (Dep't. Commerce 1993)(final results admin. review).

original investigation in which the exporter was not involved. In that case, the *Koyo* court noted, "there was no unity of parties, no unity of time frames, no unity of the administrative agencies involved, and no unity of law." 905 F.Supp. at 1120–21. In *Koyo,* as in the case now before the Court, all of those unities apply.

Commerce's methodology for calculating Union's profit margin may not result in the most accurate representation of Union's actual profit, however, "[t]he Court's role is not to determine whether the information chosen was the 'best' actually available. Rather, the Court must affirm the agency's choice if supported by substantial evidence on the record and otherwise in accordance with law." *Manifattura Emmepi,* 16 CIT at 623, 799 F.Supp. at 114. In this case, Commerce chose a reasonable method for calculating Union's profit margin. Commerce frequently discounts sales made below a company's cost of production in other contexts. *See, e.g.* 19 C.F.R. § 353.51(a) ("If the Secretary has reasonable grounds to believe or suspect that the sales on which the Secretary could base the calculation of foreign market value ... are at prices less than the cost of production, the Secretary, in calculating foreign market value, will disregard such sales. . . . "). The margin was calculated using sales data provided by Union in this investigation and verified by Commerce. Therefore, the Court finds Commerce's calculated profit margin bears a rational relationship to the sales to which it was applied.

## AK STEEL'S ISSUES

### I. Commerce's Use of Partial BIA Rather than Total BIA to Calculate Union's Dumping Margin

██ Domestic producers argue that Commerce was right to reject Union's home-market sales information, but that Commerce should have used total BIA rather than partial BIA in calculating Union's dumping margin. (Domestic Producers' Mot. J. Agency Rec. Pursuant USCIT R. 56.2 at 19). In relying on partial rather than total BIA, domestic producers argue, "Commerce: (1) failed to account for the pervasive adverse effects of Union Steel's unverifiable home market product characteristics; (2) relied on a flawed rationale for resorting to partial BIA; and (3) improperly rewarded Union Steel." *Id.* at 20. According to the domestic producers, "Because it extends to price-to-price comparisons, the sales-below-cost test, and CV profit, this deficiency, by definition, renders meaningless any margin calculated using any portion of Union Steel's data."

Commerce explained in the Final Determination that the use of total BIA was not appropriate in this case for the following reasons:

—Union's normal business practice at the time was not to retain certain production records, such as mill certificates;

—there is no evidence on the record that Union deliberately refrained from retaining those records with the purpose of impeding the Department's ability to conduct this proceeding

—we were able to verify product characteristics of the merchandise sold in the U.S. market and to link specific U.S. sales to control numbers;

—CV was associated with specific control numbers.

Final Results, 61 Fed.Reg. at 18,559. In fact, Commerce's first two reasons for applying partial rather than total BIA, having to do with the respondent's degree of cooperation, are irrelevant according to Commerce's usual practice.

The distinction between total and partial BIA is explained in *Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 18 CIT 906, 915, 865 F.Supp. 857, 865, n. 21 (1994) as follows: "Commerce uses 'total BIA' for a respondent whose reporting or verification failure is so extensive as to make its entire response unreliable.... Commerce applies 'partial BIA' when a respondent's submitted information is deficient in limited respects, yet is still reliable in most other respects." [10]

---

**10.** Commerce cites *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185 (Fed.Cir.1993), for the proposition that "[t]he Department applies total BIA when a respondent refuses to provide the information requested in a timely manner or in the form required." Final Results, 61 Fed.

Here, Commerce did not state explicitly that it was using partial rather than total BIA, due to the limited nature of Union's verification deficiencies. However, statements by Commerce in the final results demonstrate that Commerce did consider this to be a factor. *See* Final Results, 61 Fed.Reg. at 18,558 ("Union did not retain mill certificates or other documents needed to verify home-market product characteristics. However, all other documentation was maintained. . . .").

The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). Commerce did consider the limited nature of Union's verification deficiencies in choosing partial over total BIA. Commerce's third and fourth reasons for its choice, that "we were able to verify product characteristics of the merchandise sold in the U.S. market and to link specific U.S. sales to control numbers; and CV was associated with specific control numbers," demonstrate that Commerce concluded that it could adequately verify Union's submitted information, other than Union's home market product characteristics. Therefore, the Court finds, Commerce appropriately resorted to partial rather than total BIA.

## II. Commerce's Decision to Refrain from Deducting Actual Countervailing and Antidumping Duties from United States Price

■ Domestic producers argue that, in calculating U.S. price, Commerce should deduct from the price paid by the first unrelated purchaser the cost of "actual" antidumping and countervailing duties.

According to the statute, Commerce is to reduce the starting price in the United States by;

. . . the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States.

19 U.S.C. § 1677a(d)(2)(A). Domestic producers argue that the phrase "any . . . United States import duties," includes antidumping and countervailing duties because such duties are "incident to bringing the merchandise from the place of shipment . . . to the place of delivery. . . ." (Domestic Producers' Mot. J. Agency Rec. Pursuant USCIT R. 56.2 at 37–38).

The statute does not define the term "United States import duties." In the absence of such a definition, the Court will uphold Commerce's reasonable interpretation.

Commerce's regulations require that antidumping duties be deducted from U.S. price to the extent to which "the producer or reseller: (i) Paid [them] directly on behalf of the importer; or (ii) Reimbursed to the importer." 19 C.F.R. § 353.26. In other cases, Commerce's consistent policy has been not to reduce U.S. price by the amount of antidumping duties.[11]

In the Final Results, Commerce quotes its explanation for this policy as articulated in *Certain Hot–Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom,* 60 Fed.Reg. 44,009, 44010 (1995)(final results admin. review): "antidumping duties are intended to offset the effect of discriminatory pricing between . . . two markets. In this context, making an additional deduction from USP for the same antidumping duties that correct this price discrimination would result in double-counting." This is a reasonable explanation for Commerce's decision to exclude antidumping duties from its definition of "United States import duties" in this context. A similar explanation would apply

---

Reg. at 18,558. However, in *Allied Signal,* Commerce was choosing between two tiers of total BIA, one more adverse than the other. In that case, the court said it was appropriate for Commerce to base the degree of adversity on the respondent's level of cooperativeness. However,

*Allied Signal* is not applicable when Commerce is choosing between total and partial BIA.

**11.** Domestic producers do not claim that Union's antidumping duties were paid or refunded by the manufacturer, producer, seller or exporter.

to Commerce's refusal to deduct countervailing duties from United States Price.[12]

In *PQ Corp. v. United States*, 11 CIT 53, 652 F.Supp. 724 (1987), after Commerce found no dumping margin in an administrative review, the court refused to order Commerce to deduct from U.S. price the estimated antidumping duties respondent had deposited prior to completion of Commerce's administrative review. In that case, the court said, "[i]t is disputed whether 'United States import duties,' as used in the calculation of antidumping duties, refers to antidumping duties, either assessed or estimated." *Id.* at 66, 652 F.Supp. at 736. However, the court decided, "[i]f deposits of *estimated* antidumping duties entered into the calculation of present dumping margins, then those deposits would work to open up a margin where none otherwise exists." *Id.*, 11 CIT at 67, 652 F.Supp. at 737 (emphasis added). The court concluded, "[t]he determination upon remand, however, may result in a finding of dumping, in which case the separate issue of whether actual duties should be deducted in calculating final margins may arise." *Id.* at 68, 652 F.Supp. at 737. The court in *Federal–Mogul Corp. v. United States*, 17 CIT 88, 813 F.Supp. 856 (1993) also endorsed Commerce's decision not to reduce U.S. price by the amount of estimated antidumping duties deposited with Commerce.

Petitioners characterize *PQ Corp.* and *Federal–Mogul* as implicitly endorsing the deduction of actual antidumping duties. However, the Court does not agree with this characterization. In *PQ Corp.* the court explicitly left open the question whether actual antidumping duties should be deducted from United States price and the *Federal–Mogul* court never discussed the issue. Commerce's longstanding policy has been not to

make such a deduction. Because Commerce has offered a rational explanation for this policy, the Court will uphold Commerce's determination in this case.

## COMMERCE'S MOTION TO STRIKE

Attached to Union's Motion for Judgment on the Agency Record is an appendix that contains a declaration by Union's consultant, Brian Kelly, describing several meetings and conversations between Commerce officials and Union representatives. Union requests that if the agency record does not compel judgment in its favor, that the Court supplement the agency record with the Kelly declaration and grant Union summary judgment pursuant to USCIT R. 56. Union Mot. at 64. In response, Commerce filed a motion to strike the Kelly declaration, a second appendix, and all references to these materials from Union's brief. Def.'s Mot. Strike Matters Brief.

The Court finds it unnecessary to rule on Commerce's motion because even if the materials were to be made part of the administrative record, they would not change the outcome of this case. The Court would still rule in favor of Commerce on all issues.[13]

## CONCLUSION

For the reasons stated above, Commerce's determination in *Certain Corrosion–Resistant Carbon Steel Flat Products from Korea*, 61 Fed.Reg. 18,547 (Dep't. Commerce 1996)(final results admin. rev.) is affirmed in all respects.

## ORDER

This case having been duly submitted for decision, and this Court, after due delibera-

---

**12.** Petitioners also argue that if antidumping and countervailing duties do not constitute U.S. import duties, then they should be deducted from U.S. price as "additional costs, charges, and expenses ... incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States," pursuant to 19 U.S.C. § 1677a(d)(2)(A). However, such an interpretation would create the same double-counting issue Commerce is seeking to avoid in its refusal to consider coun-

tervailing and antidumping duties to be U.S. import duties.

**13.** On July 21, 1997, Union submitted a motion for a post-assignment conference to discuss the appropriate contents of the record before Commerce and the record for review before the Court. Because all parties have submitted adequate briefs on these issues, the Court finds that such a conference would be unnecessary. Union's motion is denied.

tion, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED** that Plaintiffs' Motion for Judgment Upon the Agency Record challenging aspects of the United States Department of Commerce's determination in *Certain Corrosion–Resistant Carbon Steel Flat Products from Korea,* 61 Fed.Reg. 18,547 (Dep't. Commerce 1996)(final results admin. review) is denied; and it is further

**ORDERED** that Defendant–Intervenor's Motion for Judgment Upon the Agency Record challenging aspects of the final results is denied; and it is further

**ORDERED** that Commerce's determination is sustained in all respects.